PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

v.

THOMAS CREIGHTON SHRADER,

        *Defendant-Appellant.*

No. 10-5169

Appeal from the United States District Court
for the Southern District of West Virginia, at Bluefield.
Irene C. Berger, District Judge.
(1:09-cr-00270-1)

Argued: December 9, 2011

Decided: April 4, 2012

Before WILKINSON, MOTZ, and SHEDD, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Motz and Judge Shedd joined.

## COUNSEL

**ARGUED:** Jonathan D. Byrne, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant. Thomas Charles Ryan, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee. **ON BRIEF:** Mary Lou Newberger, Federal Public

Defender, Christian M. Capece, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant. R. Booth Goodwin II, United States Attorney, Charleston, West Virginia, for Appellee.

## OPINION

WILKINSON, Circuit Judge:

Over the course of more than three decades, Thomas Creighton Shrader harassed and intimidated D.S. and later her husband R.S., causing them to fear for their safety and that of their children. He stands convicted after trial of two counts of stalking through the use of a facility of interstate commerce and one count of being a felon in possession of a firearm. Shrader raises multiple issues in this appeal, including the vagueness of the stalking statute and the length of his sentence. Accepting his contentions, however, would undermine Congress' efforts to protect people like D.S. and R.S. from precisely the sort of terrifying conduct that took place in this case. We therefore affirm.

I.

A.

Starting sometime around 1973, while still a high school student in McDowell County, West Virginia, D.S. began a relationship with Shrader. Over time he became increasingly demanding and possessive, repeatedly appearing uninvited at D.S.'s house. This led her to break off the relationship in 1975 after approximately two years. When she did so, the defendant threatened to kill D.S.'s two nephews if she did not continue seeing him. Around the same time, the defendant physically assaulted D.S. at her workplace, choking her in an elevator.

On July 16, 1975, the defendant confronted D.S. while she was at home with her mother, Geneva Miller, and a family friend, Rusty Adams. D.S. refused to leave with the defendant. Twenty minutes later, he returned to her home with a high-powered rifle. Entering the house, he shot and killed Rusty Adams in a side room. He next shot Geneva Miller, who died ten days later of gangrene contracted in her wound. D.S. ran out of the house, fleeing across the street to the home of her neighbor, John Kowaleski. Shrader continued shooting and wounded Kowaleski in the arm. The defendant was subdued and arrested, and was charged in West Virginia state court with two counts of first degree murder in violation of W. Va. Code § 61-2-1 and one count of unlawful wounding in violation of W. Va. Code § 61-2-9.

Shrader pled guilty to these charges on January 20, 1976, and was sentenced to concurrent life sentences with a recommendation of mercy on the murder charges as well as an additional year of incarceration for the wounding offense. Approximately a year later, Shrader escaped from prison. D.S. and her younger sister were taken into protective custody by the state police. Shrader was recaptured and sentenced to an additional year of imprisonment for the escape.

During his incarceration, Shrader continued to contact D.S. He sent approximately fifteen to twenty letters to her at the bank where she worked, repeatedly referencing his murder of D.S.'s friend and mother, and causing D.S. to feel severely threatened. In 1978, the defendant filed a lawsuit against D.S. in Mercer County, West Virginia, alleging that D.S. had breached a promise to marry him and seeking $700,000 in damages from her.

By this time, D.S. had married R.S. In 1979, they moved to Texas, severing all ties with West Virginia, and took a variety of additional precautions to ensure their safety and anonymity. This did not deter Shrader, who wrote letters to D.S.'s father, mother-in-law, and sister, asking whether D.S.'s fam-

ily was involved in witchcraft, whether D.S. had ever had an abortion, and requesting recent pictures of D.S. He alleged in these letters that he pled guilty to the murders in 1975 to cover up a conspiracy between himself and D.S., and threatened that he would "convict [D.S.] of Rusties death." In 1993, Shrader was released from prison on parole, and was released from parole in 1999.

Beginning on August 6, 2008, Shrader made a series of phone calls to the unlisted number of D.S.'s Texas home. Speaking with D.S., he identified himself and said, "I need to talk to your kids before we die." She denied having children, but Shrader identified them by name. D.S. called 911, but the local police were unable to help her, even though D.S. made clear that she was living in terror. The defendant called back at least four times that evening. He spoke with R.S. as well as D.S., proclaiming to him that D.S. "is my God and I would have done anything for my God," and telling R.S. that he had obtained their contact information in Texas through a Freedom of Information Act request for letters mailed by the parole board notifying D.S. of Shrader's parole hearings.

As a result of these calls, D.S. became afraid for her children to leave their home. R.S. began sleeping with a loaded shotgun under the bed, prepared to defend his family. Shrader persisted, obtaining a photograph of D.S.'s daughter from the website MySpace, and attempting to call her as well. Shrader also showed his friend Carol Miller aerial photographs of D.S.'s home in Texas, commenting about where he could covertly observe the home from across the street. He also formulated a plan to send underwear to D.S.'s daughter with the intent to anger D.S.

On October 30, 2009, R.S. received a UPS package addressed to his wife at their Texas home. Inside was a thirty-two page letter from Shrader. In the letter, Shrader warned D.S. that she had to read it "for [her] own good . . . or don't read and face the consequences blindly." He reiterated his

delusion that the murders of Rusty Adams and Geneva Miller were part of a plot hatched by D.S.: "Your plan didn't work and it cost the life of your mother." He claimed that D.S. had aborted their child, wishing for "God to take one of your children's live's in an accident to show me that you did have an abortion." Shrader described how he almost killed D.S. in graphic detail:

> You have failed to realize that the only reason (after everything fell apart at your house that day), I did not shoot you in the back that day as you ran down the middle of the road for Kowalski's house. Was because I was so deeply in love with you and believed you felt the same for me. Even though while standing on the front porch of the house I had the rifle raised and the cross hair's of the scope were dead center between your shoulder blades. Bye-bye heart, bye-bye lungs, sternum and some ribs.

And he warned D.S. about possible physical violence against her: "Be smart also! Realize I have never laid a finger on you or hurt you physically. In fact I could have, like I told you earlier in this latter, while you were running down the road. Or on the morning that I escaped from the McDowell County Jail." Finally, he closed the letter with thinly-veiled threats about the future, claiming that "It's time to face the piper." He concluded that "From the date you receive this, I am allowing two (2) weeks or 14 days to pass before I initiate my next step."

Understandably terrified, D.S. and R.S. contacted the FBI, which secured a criminal complaint against Shrader and a warrant for his arrest. On November 13, 2009, FBI agents went to the home that Shrader shared with his aunt, Elizabeth Jones, to execute the arrest warrant. Shrader was alone at the house when the agents arrived. He informed Special Agent Terry Schwartz that there were firearms in the home, but refused to consent to a search of the premises to recover them.

While several agents took the defendant into custody, Agent Schwartz and other officers awaited Jones's return. Two hours later, she arrived, and consented to the search. In the dining room of the home, officers found a cabinet containing two shotguns and a rifle.

B.

Shrader was ultimately charged with two counts of stalking via a facility of interstate commerce in violation of 18 U.S.C. § 2261A(2)—one alleged that he targeted D.S. and the other that he targeted R.S.—and one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The counts were severed and two separate trials were held, first on the firearms charge and subsequently on the two stalking counts.

Prior to the firearms trial, Shrader moved to suppress the firearms found in the house, arguing that the agents violated the Supreme Court's decision in *Georgia v. Randolph*, 547 U.S. 103 (2006), by soliciting consent from his aunt after he had been arrested even though he already refused permission for the search. The district court denied the motion, finding that *Randolph* required the defendant to be present at the time his aunt consented in order to object to the search, and that there was "no evidence to suggest that [the agents'] intent was to extraordinarily render Defendant away from the scene to violate his Fourth Amendment rights."

At the close of the firearms trial, Shrader requested that the court instruct the jury that "[t]he mere proximity of the firearms to Mr. Shrader goes only to the firearms' accessibility and not to the dominion or control which must be proven in order to establish possession of the firearms." The district court instead instructed the jury that "[e]vidence of the mere proximity of the firearms to Mr. Shrader may establish only the firearms' accessibility. However, the proximity of the firearms to Mr. Shrader may also help to establish dominion and

control depending on the inferences you draw from the evidence presented in the case." Shrader's counsel again objected, but was overruled, and Shrader was convicted on July 14, 2010.

Shrader filed a wide variety of motions prior to his stalking trial. First, he moved to dismiss the indictment on the grounds that 18 U.S.C. § 2261A(2) was unconstitutionally vague. The district court disagreed, finding that the plain terms of the statute, which incorporate a specific intent requirement, were enough to provide "a person of ordinary intelligence fair notice of what is prohibited." Second, Shrader filed a motion to elect, seeking to compel the government to proceed on only one of the stalking counts and arguing that the indictment was multiplicitous because the stalking statute's unit of prosecution is the "course of conduct" that the defendant engaged in. Again the district court disagreed, finding that the unambiguous terms of the statute "define[ ] the unit of prosecution as the 'person,'" and that the same course of conduct could be prosecuted twice if the government could show "two different *mens rea* on the part of a defendant" to target two different victims.

On August 20, 2010, the defendant was convicted of both counts in the stalking trial. Prior to his sentencing, Shrader objected to the Pre-Sentence Report's recommendation that he be sentenced under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(1), due to his prior convictions for murder, wounding, and escape. The government conceded that the escape did not qualify as a felony under the ACCA, because it was not subject to a penalty of greater than one year. As to his other crimes, Shrader conceded that they met the statutory definition of violent felonies, but disputed that they had been committed on different occasions, as the ACCA requires. In response, the government offered evidence that had been admitted at the stalking trial, including the testimony of D.S. and the defendant's letter. Shrader disputed the use of this evidence, arguing that it was not approved under the

Supreme Court's decision in *Shepard v. United States*, 544 U.S. 13 (2005). The district court disagreed, finding that because "the issue is not whether the crimes of conviction are violent crimes . . . but whether or not they occurred on occasions separate from one another," *Shepard* was inapplicable. Finding that the evidence showed that the two murders and the wounding were indeed separate occasions, the district court sentenced Shrader as an armed career criminal to 235 months in prison followed by five years of supervised release. This appeal followed. We address each of the six issues that Shrader raises in turn.

## II.

Shrader first argues that the district court erred in denying his motion to suppress the firearms recovered from the house he shared with his aunt. He contends that her consent to a search of their shared home was invalid because he had previously refused to consent to the search. When examining the denial of a motion to suppress, we review the district court's legal determinations *de novo* and its factual conclusions for clear error. *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008). Because the district court denied the defendant's motion, we construe the evidence in the light most favorable to the government. *Id.*

It has long been established that "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over . . . the premises." *United States v. Matlock*, 415 U.S. 164, 171 (1974). Indeed, so long as the investigating officers "reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises," evidence obtained in such a search will not be suppressed. *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990).

Shrader does not dispute that his aunt had authority to consent to the search. He further acknowledges that her consent was voluntarily given. Instead, he relies on the Supreme Court's holding in *Georgia v. Randolph*, 547 U.S. 103 (2006), which held that "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Id.* at 122-23.

But Shrader has failed to satisfy a key requirement of *Randolph*: he was not "physically present" to object to his aunt's consent. The Supreme Court made clear that to defeat a cotenant's consent, the defendant must be both "present and objecting." *Id.* at 114. The Court's decision is replete with references to the requirement that the defendant be "standing at the door and expressly refusing consent" at the time the police solicit entry from the cotenant. *Id.* at 119; *see also id.* at 120 (cotenant consent is invalid "over the express refusal of consent by a physically present resident"); *id.* at 121 (search is invalid "if a potential defendant with self-interest in objecting is in fact at the door").

Of course, police may not seek to exploit this rule by "remov[ing] the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." *Id.* at 121. But there is no evidence that the police did so in this case. They went to the house for the express purpose of executing a valid warrant for Shrader's arrest, so his subsequent arrest and removal from the premises cannot be considered a pretext for later seeking consent from his aunt. Indeed, Shrader concedes that "there was no evidence in this case that the officers who took Shrader away after his arrest did so to defeat his Fourth Amendment rights." Appellant's Br. at 41.

Shrader urges us, however, to expand the holding of *Randolph* and conclude that his earlier refusal vitiates his aunt's later consent, even though he was absent from the premises. Physical presence may not be dismissed as a mere function of the facts of *Randolph*, however. That presence reflected the

"widely shared social expectations" that informed the Court's ruling. *Randolph*, 547 U.S. at 111. The Court noted that "a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out.'" *Id.* at 113; *see also id.* at 114 ("[T]he co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant.") The Court plainly gave careful thought to the scope of the physical presence requirement that it articulated:

> [W]e are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out. This is the line we draw, and we think the formalism is justified. *Id.* at 121.

This case falls squarely on the permissible side of the line. Because Shrader was absent from the premises, and there was no evidence that he was arrested for the purpose of nullifying his refusal to consent to the search, his aunt's consent provided adequate permission for the police to search the house, notwithstanding his earlier objection.

In so holding, we join the Seventh and Eighth Circuits in adhering to the clearly drawn rule of *Randolph* and giving effect to the Supreme Court's explicit requirement that the defendant be physically present to dispute his cotenant's consent. *See United States v. Henderson*, 536 F.3d 776 (7th Cir. 2008); *United States v. Hudspeth*, 518 F.3d 954 (8th Cir. 2008) (en banc). We decline to adopt the more expansive view of the Ninth Circuit which permits a defendant's refusal to operate indefinitely, "barring some objective manifestation that he has changed his position and no longer objects."

*United States v. Murphy*, 516 F.3d 1117, 1125 (9th Cir. 2008). This latter approach raises practical problems. How broadly is constructive knowledge of a suspect's prior refusal to consent to be imputed to other officers? Must a suspect expressly indicate that he has changed his mind in the future, or may that be assessed from the totality of the circumstances? Is there some point at which the passage of time renders a prior objection inoperative? The *Murphy* interpretation of *Randolph* would involve courts in such questions, diverting attention from the basic social expectations that underlie not only the opinion in *Randolph*, but the larger corpus of Fourth Amendment jurisprudence. Careful observance of the requirement that an objecting cotenant be physically present thus not only shows fealty to the Supreme Court's precedent, but also focuses police and courts on the customary norms that form the basis for this area of law.

III.

At the close of the firearms trial, Shrader challenged the district court's refusal to give his proposed instruction to the jury with respect to his constructive possession of a firearm. The evidence at trial demonstrated that the firearms were located in a cabinet with a glass front in a dining room directly adjacent to the defendant's bedroom. Photographs showed that the gun cabinet was but a few feet from the entrance to Shrader's bedroom, visible through the open doorway.

Moreover, the testimony of Shrader's cotenant, his aunt Elizabeth Jones, indicated that the firearms were under Shrader's control. Jones lived in the house only part-time. She testified that she was "scared to death" of guns—she was even reluctant to look at them during her cross-examination, and that she was unaware of whether the cabinet had a lock "because [she] didn't mess with it." She explicitly stated that she never handled the guns and had even attempted to obscure the front of the gun cabinet with a cardboard box so she did not

have to see the guns. She testified that she believed it was Shrader who had obtained the weapons and brought them into the house and that it "was just his hobby."

Shrader's counsel had requested that the court charge the jury that "mere proximity of the firearms to Mr. Shrader goes only to the firearms' accessibility and not the dominion or control which must be proven in order to establish possession of the firearms." The court instead instructed the jury that "[e]vidence of the mere proximity of the firearms to Mr. Shrader may establish only the firearms' accessibility. However, the proximity of the firearms to Mr. Shrader may also help to establish dominion or control depending on the inferences you draw from the evidence in the case."

We review the district court's refusal to give a proffered instruction for an abuse of discretion. *United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010). In order to conclude that the district court erred in refusing to give the requested charge, the defendant's proposed instruction must be (1) correct; (2) not substantially covered by the court's charge; and (3) dealing with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense. *United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009). In assessing these factors, we may not minutely parse the district court's words; rather we consider "whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." *United States v. Rahman*, 83 F.3d 89, 92 (4th Cir. 1996).

Shrader contends his proposed instruction draws from *United States v. Blue*, 957 F.2d 106 (4th Cir. 1992), in which we held that "this court requires more evidence of dominion and control than" mere proximity of the defendant to a firearm. *Id.* at 108. But while we have held that proximity alone is not conclusive on the question of dominion and control, we have never held it to be irrelevant. On the contrary, we have

repeatedly affirmed the right of juries to consider proximity as a part of their analysis of a defendant's constructive possession. *See, e.g.*, *United States v. Kimbrough*, 477 F.3d 144, 147 n.5 (4th Cir. 2007) ("[A] fact-finder could infer Appellee's possession of the gun from its presence in the basement where he lived."); *United States v. Shorter*, 328 F.3d 167, 172 (4th Cir. 2003) ("[T]he fact that the firearms and marijuana were found in Shorter's home permits an inference of constructive possession.").

Here, the district court's instruction accurately stated the law, indeed more so than Shrader's proposed instruction. It would not fairly characterize our cases to inform the jury as Shrader requested that "mere proximity of the firearms to Mr. Shrader goes *only* to the firearms' accessibility and *not* the dominion or control" (emphasis added). That might leave jurors with the impression that once they had determined that the defendant had access to a firearm, they were to disregard its proximity in assessing his control over it. While proximity by itself is not enough, the nature of the proximity can be quite pertinent to what type and amount of additional evidence is required. Thus, the district court accurately informed the jury that proximity alone goes only to accessibility, but when viewed in light of the remaining evidence in the case, can form part of the tableau that justifies a conviction based on constructive possession.

In addition, this court recently considered in *United States v. Herder*, 594 F.3d 352 (4th Cir. 2010), whether a defendant in a constructive possession case was entitled as of right to a "mere proximity" instruction. In that case, the defendant, like Shrader, relied on *Blue* to request an instruction that "mere proximity of contraband to an occupant is insufficient to establish constructive possession." *Id.* at 360. The district court refused, and we affirmed, holding that so long as "the instructions actually given to the jury plainly required proof of knowledge and control," the jury could not have erroneously convicted the defendant on the basis of proximity alone.

*Id.* at 361 (citing *United States v. Hendricks*, 319 F.3d 993, 1006 (7th Cir. 2003); *United States v. Vasquez*, 82 F.3d 574, 577 (2d Cir. 1996); *United States v. Rojas*, 537 F.2d 216, 219-20 (5th Cir. 1976)).

The district court here repeatedly emphasized the need for the jury to find knowing possession beyond a reasonable doubt in order to convict. First, it accurately stated the law and defined knowing possession: "[T]he United States must prove beyond a reasonable doubt that the defendant knowingly possessed a firearm. 'Knowingly' means voluntarily and intentionally and not because of mistake or accident or other innocent reason." Second, it applied that definition to the requirement of dominion or control: "A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing . . . is then in constructive possession of it." Finally, the district court emphasized the need to prove dominion or control: "[T]he United States must produce either direct or circumstantial evidence showing . . . beyond a reasonable doubt the defendant's ownership, dominion, or control over the firearms." In short, as in *Herder*, there was no risk that the jury drew such impermissible inferences that it convicted Shrader on the basis of proximity alone. The district court thus did not abuse its discretion in refusing to give Shrader's proposed instruction.

## IV.

As to his stalking convictions, Shrader argues that 18 U.S.C. § 2261A(2) is unconstitutionally vague. The statute contains three important elements. First, the defendant must possess either the intent "to kill, injure, harass, or place under surveillance with intent to kill, injure, harass, or intimidate, or cause substantial emotional distress to a person in another State," 18 U.S.C. § 2261A(2)(A), or the intent to place that person "in reasonable fear of the death of, or serious bodily injury to that person, a member of the immediate family . . .

of that person, or a spouse or intimate partner of that person,"
*id.* § 2261A(2)(B). Second, the defendant must pursue that
intention through a "course of conduct," defined as "a pattern
of conduct composed of 2 or more acts, evidencing a continu-
ity of purpose," *id.* § 2266(2), that makes use of a facility of
interstate commerce, *id.* § 2261A(2). Finally, the defendant's
conduct must in fact "cause[ ] substantial emotional distress
to [the intended victim] or place[ ] that person in reasonable
fear of the death of, or serious bodily injury to any of the per-
sons described" above. *Id.*

Shrader contends that the first element of the statute is
vague because the operative terms "harass[ ] or intimidate"
are not explicitly defined. He similarly argues that the second
element is vague because the statute fails to specify whether
all acts in the required "course of conduct" must be committed
with the specific intent of instilling fear.

A.

We review the constitutionality of a statute *de novo*. *United
States v. Sun*, 278 F.3d 302, 308 (4th Cir. 2002). A statute is
impermissibly vague if it either (1) "fails to provide people of
ordinary intelligence a reasonable opportunity to understand
what conduct it prohibits" or (2) "authorizes or even encour-
ages arbitrary and discriminatory enforcement." *Hill v. Colo-
rado*, 530 U.S. 703, 732 (2000). In assessing these standards,
"perfect clarity and precise guidance have never been
required." *Ward v. Rock Against Racism*, 491 U.S. 781, 794
(1989). Instead, we consider whether a statute's prohibitions
"are set out in terms that the ordinary person exercising ordi-
nary common sense can sufficiently understand and comply
with." *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carri-
ers*, 413 U.S. 548, 579 (1973).

As a result, we cannot adopt the approach Shrader urges,
throwing up our hands and declaring a statute vague simply
because it does not include the most elaborate or the most

specific definitions possible. The test for vagueness "is necessarily a practical rather than hypertechnical one," *United States v. Biocic*, 928 F.2d 112, 114 (4th Cir. 1991), and when a statute fails to provide an explicit definition, we may resort to ordinary meaning and common sense, considering whether the statute "conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *United States v. Petrillo*, 332 U.S. 1, 8 (1947).

Here, we think that a common sense reading of the statute adequately defines the prohibited conduct. "Harass" and "intimidate" are not obscure words. Most people would readily understand the former to mean "to disturb persistently; torment, as with troubles or cares; bother continually; pester; persecute," *Random House Dictionary of the English Language* 870 (2d ed. 1987); and the latter to mean "to make timid; fill with fear," *id.* at 1000. In *United States v. Bowker*, 372 F.3d 365, 380-82 (6th Cir. 2004), *rev'd on other grounds*, 543 U.S. 1182 (2005), the Sixth Circuit upheld this same statute against an identical vagueness challenge. That court too found that "harass[ ] or intimidate" could be adequately defined "by reference to judicial decisions, common law, dictionaries, and the words themselves because they possess a common and generally accepted meaning." *Id.* at 382 (quoting *Staley v. Jones*, 239 F.3d 769, 791-92 (6th Cir. 2001)).

In addition, Shrader's claim that the intent element of the statute is inadequately defined is in tension with the Supreme Court's instruction that, rather than being a source of fatal vagueness, "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *see also Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("[T]he constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*."). In contrast to previously disap-

proved statutes that merely set out the subjective effects of conduct and imposed penalties for causing that injury, *see, e.g.*, *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (finding ordinance prohibiting conduct "annoying to persons passing by" unconstitutionally vague), this statute required the government to prove that Shrader both intended to cause his victims serious harm and did in fact do so. *See Bowker*, 372 F.3d at 381-82 (relying on the connection between the "requirement that a perpetrator intend to harass a victim" and the "concrete harm requirement" to conclude that § 2261(A) was not vague).

By focusing on the words "harass[ ] or intimidate," Shrader ignores that the statute permits a variety of intentions to suffice: "to kill, injure, harass, or intimidate, or cause substantial emotional distress to a person." 18 U.S.C. § 2261A(2)(a). "Congress often uses multiple words with overlapping meaning to capture a broad swath of conduct." *United States v. Laureys*, 653 F.3d 27, 41 (D.C. Cir. 2011). Shrader cannot plausibly claim this string of verbs left him clueless. He cannot contend that the law failed "to distinguish between innocent conduct and conduct threatening harm," *City of Chicago v. Morales*, 527 U.S. 41, 57 (1999). It is an element of the crime that he have intended harm to a particular victim. And it is similarly an element that the intended target have suffered substantial emotional distress as a result. Given that the government must prove both intent and effect, we need not worry that the statute sets an unclear trap for the unwary.

### B.

Shrader also argues that the statute is unconstitutionally vague because it does not define whether all acts included in the prohibited "course of conduct" must be done with the specific intent to cause harm required by the statute.

The statute defines the required "course of conduct" as "a pattern of conduct composed of 2 or more acts, evidencing a

continuity of purpose." 18 U.S.C. § 2266(2). This latter part of the definition is significant. While the statute does not impose a requirement that the government prove that each act was intended in isolation to cause serious distress or fear of bodily injury to the victim, the government is required to show that the totality of the defendant's conduct "evidenc[ed] a continuity of purpose" to achieve the criminal end. The specific intent requirement thus modifies the cumulative course of conduct as a whole.

This statutory scheme reflects a clear understanding on the part of Congress that while severe emotional distress can of course be the result of discrete traumatic acts, the persistent efforts of a disturbed harasser over a period of time—in this case, virtually D.S.'s entire adult life—can be equally or even more injurious. The cumulative effect of a course of stalking conduct may be greater than the sum of its individual parts. To read in a requirement that each act have its own specific intent element would undo the law's protection for victims whose anguish is the result of persistent or repetitive conduct on the part of a harasser. Moreover, the statute avoids sweeping up innocent acts by requiring that the course of conduct "evidenc[e] a continuity of purpose" to cause the proscribed harm. It of course remains open to a defendant to argue that the charged acts were innocent or mistaken, and therefore do not meet the clear textual requirement that the course of conduct "evidenc[e] a continuity of purpose," but that is an argument that sounds in sufficiency of the evidence, not vagueness.

## C.

Further, the statute clearly proscribed Shrader's particular conduct in this case. There can be little doubt that Shrader's conduct was harassing and intimidating to D.S. and R.S. Shrader murdered D.S.'s mother and close friend. His subsequent words carried the most serious import, uttered as they were by someone with such a bloody past. Shrader warned

D.S. over the phone that he "needed to talk to [her] kids before we die." He continually alleged that she was complicit in the murders to which he pleaded guilty, pressing his delusion that she had hatched the plot to kill Rusty Adams and that she was responsible for her mother's death as a result. Shrader persisted in calling D.S.'s home after R.S. warned him that such contact was to say the least unwelcome. He formulated a plan to send D.S.'s daughter underwear for the express purpose of harassing D.S.

The most obvious vehicle of Shrader's harassment and intimidation was his manifesto. In it, he wished for "God to take one of [D.S. and R.S.'s] children's lives in an accident." He described his murderous rampage and reminded D.S. that she too could have suffered the same fate. He threatened to spread his allegation of her involvement in her own mother's murder, making her "famous" because he was "sure that [he] could get a lot of publicity." And he closed with a warning that he would take further action if D.S. did not comply with his wishes. The letter was only the beginning, two weeks later he would "initiate [his] next step."

Whatever other definitions one might hypothesize for the meaning of "harass[ ] or intimidate," there can be little doubt that Shrader's stalking falls within the conduct the statute is intended to proscribe. Shrader's own words evince his intent to "cause substantial emotional distress," 18 U.S.C. § 2261A(2)(A), to D.S. and R.S. and to place them "in reasonable fear of the death of, or serious bodily injury to" themselves and "member[s] of the[ir] immediate family," *id.* § 2261A(2)(B)(i-ii). In short, we reject Shrader's contention that his stalking convictions must be overturned on vagueness grounds.*

---

*Shrader also raises a sufficiency of the evidence claim. We have reviewed the evidence in detail and described it herein. We reject Shrader's contention on this matter as an insubstantial one.

V.

Shrader next claims that the district court erred in concluding that Counts One and Two of the Second Superseding Indictment were not multiplicitous, arguing that 18 U.S.C. § 2261A(2) permits only one punishment for a "course of conduct," regardless of the number of victims of that conduct. Whether an indictment charges "one or more counts that are actually a single offense charged multiple times" is a question of law that we review de novo. *United States v. Goodine*, 400 F.3d 202, 207 n.7 (4th Cir. 2005).

The rule against multiplicity is rooted in the Double Jeopardy Clause of the Fifth Amendment, which serves both the familiar function of prohibiting "successive prosecutions for the same offense" as well as "the imposition of cumulative punishments for the same offense in a single criminal trial." *United States v. Ragins*, 840 F.2d 1184, 1187 (4th Cir. 1988). When a defendant is charged with multiple violations of the same statute arising from the same course of conduct, the court must consider "[w]hat Congress has made the allowable unit of prosecution," *Bell v. United States*, 349 U.S. 81, 81 (1955) (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221 (1952)). "To do so, we must look to the language of the statute, being mindful that any ambiguity must be resolved in favor of the defendant under the rule of lenity." *United States v. Bennafield*, 287 F.3d 320, 323 (4th Cir. 2002).

We agree with the district court that 18 U.S.C. § 2261A(2) unambiguously makes the victim, rather than the course of conduct, the unit of prosecution. We need look no further than the plain words of the statute to reach this conclusion.

First, to violate the provision, a defendant must act "with the [specific] intent" either to injure or to cause distress to a particular individual. *See id.* §§ 2261A(2)(A-B). Not just any person will suffice; it must be "a person in another State or

tribal jurisdiction or within the special maritime and territorial jurisdiction of the United States." *Id.* A defendant may violate the statute by acting with the specific intent to cause a person to fear for the life and limb of another, but those categories are narrowly circumscribed to "that person," *id.* § 2261A(2)(B)(i); "a member of the immediate family . . . of that person," *id.* § 2261A(2)(B)(ii); or "a spouse or intimate partner of that person;" *id.* § 2261A(2)(B)(ii). In short, this statute does not punish fungible acts, such as possession of cocaine in two different receptacles, *see, e.g.*, *Bennafield*, 287 F.3d at 323; but rather defines the defendant's crime—and therefore the unit of prosecution—in terms of his intent to strike fear in a particular individual.

Second, not only must the defendant possess the requisite intent towards a specific victim, but the statute also requires that his intimidating conduct actually induce fear in "that person." 18 U.S.C. § 2261A(2). This is more than just an element of the crime—the effect on a particular victim is also how Congress has chosen to allocate punishment for the offense. In 18 U.S.C. § 2261(b), Congress provided a scale of punishments depending on the gravity of harm done by the defendant, including "life or any term of years, if death of the victim results," *id.* § 2261(b)(1); "not more than 20 years if permanent disfigurement or life threatening bodily injury to the victim results," *id.* § 2261(b)(2); and "not more than 10 years, if serious bodily injury to the victim results," *id.* § 2261(b)(3). Thus, the statute's terms unambiguously contemplate that the unit of prosecution is the targeted individual, requiring that the defendant act with intent towards a particular "person," that his actions produce the requisite effect in "that person," and defining punishment in terms of the effect on "the victim."

That Shrader's conduct constitutes two separate offenses under the plain text of the statute can be confirmed by resort to an analogous test for violations of the Double Jeopardy Clause: "whether each [offense] requires proof of a fact which

the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). While this test is traditionally used to determine whether a single course of conduct violates different statutory provisions, *see Goodine*, 400 F.3d at 207, courts have noted its utility in assessing whether multiple counts of the same statutory offense are multiplicitous, *see, e.g.*, *United States v. Swaim*, 757 F.2d 1530, 1536-37 (5th Cir. 1985). Here, the government was required to prove different intents to harm two victims to convict the defendant on the two separate counts. Count One required evidence that the defendant acted "to place DS in reasonable fear," Sec. Sup. Ind. at 3; and Count Two required distinct proof that Shrader acted "to place RS in reasonable fear," *id.* at 4. Thus not only does the statute unambiguously provide that the unit of prosecution is the individual victim, but the charging document also requires proof of different facts as to the two separate counts, further confirming that the two charges were not multiplicitous.

This statutory scheme stands in sharp contrast to those cases Shrader cites in which courts have found indictments to be multiplicitous. As an initial matter, *Bell v. United States*, 349 U.S. 81 (1955), and *Ladner v. United States*, 358 U.S. 169 (1958), analyzed statutes that the Supreme Court considered ambiguous as to the unit of prosecution, and so the conclusion that multiple counts were impermissible was driven by the canon that "the ambiguity should be resolved in favor of lenity" to the defendant. *Bell*, 349 U.S. at 83. We need not resort to that tiebreaking device in this case, having concluded above that Congress has "fix[ed] the punishment for a federal offense clearly and without ambiguity." *Id.* at 84.

We therefore affirm the district court's determination that Counts One and Two of the Second Superseding Indictment were not multiplicitous.

## VI.

The district court in this case conducted a lengthy and detailed sentencing hearing, following equally substantial

written submissions from the parties. The district court heard testimony, considered extensive legal arguments, and discussed with care both the relevant law and the particular facts that led to Shrader's conviction and warranted a serious sentence of imprisonment. The parties argue on appeal over the propriety of Shrader's 235 month sentence.

It is plain that the district court found this sentence appropriate, explaining at great length its conclusion that this was "a just sentence . . . and is not more than is necessary." Tr. of Sentencing Hearing, J.A. 1063-64. The district court noted the defendant's "long history which we've all talked about today of harassment, threats, and violence towards [D.S.] and her family, specifically beginning with the harassment prior to the murder of Mr. Adams and [D.S.'s] mother . . . and also the murders themselves." *Id.* at 1063. The district court found that Shrader engaged in a disturbing "pattern of conduct," where Shrader repeatedly "acted on [his] obsession [with D.S.]," beginning before the murders and including "when [he] escaped during [his] time in jail" and "efforts while . . . incarcerated and afterwards to contact [D.S.'s] family." *Id.* at 1064-65. The court also discussed the defendant's attitude about his crimes, noting that not only had Shrader "not taken responsibility for [his] actions," *id.* at 1064, but had instead "give[n] up [his] life in order to cause the type of difficulty for [D.S.'s family] that [he] caused," *id.* at 1063. Finally, the district court emphasized the need for a long sentence to deter Shrader from future harassing or violent conduct, noting that he was "incarcerated for 18 years and that provided no deterrence whatsoever." *Id.* at 1065. The district court summarized the need for the sentence according to the factors outlined in 18 U.S.C. § 3553(a), expressing the "hope that this sentence will promote respect for the law, that it will protect the public, and it is my hope that it will provide deterrence." *Id.*

The 235 month sentence the district court imposed is also within the 240 month statutory maximum authorized for Shrader's three counts of conviction (a five year maximum

for each of two counts of violating 18 U.S.C. § 2261A(2) and a ten year maximum for one count of violating 18 U.S.C. § 922(g)(1), yielding a cumulative maximum sentence of twenty years of imprisonment). We therefore need not address the propriety of the ACCA enhancement, because an upward variance or departure in this case would produce exactly the same result and because the transcript makes clear that the sentence herein, irrespective of any ACCA enhancement, plainly effectuated the trial court's sentencing intent. *See United States v. Savillon-Matute*, 636 F.3d 119, 123-24 (4th Cir. 2011) (remand unnecessary where district court discussed § 3553(a) factors and where same sentencing result would obtain). For the foregoing reasons, the judgment is affirmed.

## VII.

We conclude by commending the trial court for its careful and professional conduct of proceedings. Perhaps after so many decades the criminal justice system will have restored to this beleaguered family some measure of peace.

The judgment is

*AFFIRMED*.