*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CO-480

JOY WHYLIE, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-367-11)

(Hon. Robert I. Richter, Trial Judge)

(Argued June 12, 2014                    Decided August 28, 2014)

*Andrew R. Szekely* for appellant.

*Nicholas P. Coleman*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman, John P. Mannarino*, and *Thomas S. Rees*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY and THOMPSON, *Associate Judges*, and KING, *Senior Judge*.

THOMPSON, *Associate Judge*:  Following a jury trial, appellant Joy Whylie was found guilty of second-degree identity theft, four counts of felony stalking, one count of misdemeanor stalking, ten counts of felony contempt, and three

counts of misdemeanor contempt.[1] After she was sentenced, she filed a motion to correct an illegal sentence, arguing that her harassing phone calls, which occurred over an eight-month period, constituted a single course of conduct punishable by only a single sentence for one count of stalking. Appellant now appeals the denial of that motion. Resolving the appeal requires us to decide whether the stalking counts of which appellant was convicted were separate units of prosecution. For the reasons that follow, we conclude that most of the counts were separately punishable and that the trial court did not err in declining to "correct" appellant's separate and consecutive sentences for counts 1, 14, and 24. However, we conclude that the court did err in letting appellant's separate and consecutive sentences for counts 5 and 7 stand and that these sentences must merge.

We therefore affirm the court's ruling declining to vacate the sentences as to counts 1, 14, and 24. We remand for the court to vacate the sentence for count 5 or the sentence for count 7.

---

[1] Appellant was acquitted of one count of felony threats, and the jury was unable to reach a verdict as to one count of felony contempt, one count of misdemeanor contempt, and all of the remaining counts of felony threats. On September 28, 2012, this court affirmed appellant's convictions in an unpublished order in case number 11-CF-1132.

## I.   Background

In February 2010, Melody Parker began working as a nurse in the adolescent unit at the Psychiatric Institute of Washington (PIW), and was warned that a crank caller, appellant Whylie, frequently called the unit.  On June 14, 2010, Parker received her first call from appellant, on a PIW line, directed specifically to her. During thirty to fifty subsequent calls on the same day, appellant spoke with Parker and, *inter alia*, called her a "dumb bitch," told her that she had "started a war[,]" threatened to "beat [her] ass," told Parker that she and two co-workers were going to "jump" Parker, and tried to "bait" Parker into coming to fight with her.

Appellant resumed calling PIW during Parker's shift on the following day and told Parker during various calls that Parker didn't know who she was "dealing with" and that she and two co-workers were "looking for [Parker]" because they were "going to beat [her] ass[.]"  Appellant continued calling throughout that day, making fifty to one hundred calls, and repeated many of the threats she had previously made against Parker.

On June 17, 2010, Parker obtained from the Superior Court a temporary restraining order that prohibited appellant from contacting her. Notwithstanding the order, appellant continued to call Parker at PIW that day, throughout the rest of the month of June, and into July, telling Parker that she would see her in court and sometimes telling the PIW employees who answered the phone that she was Parker's mother in order to trick Parker into speaking to her.[2]

On July 16, 2010, Parker appeared in court for a hearing on her petition for a final protective order. After she played recordings she had made of some of appellant's calls, in which appellant made references to the July 16 court date, the court granted the protective order. During calls that she made to Parker at PIW later that day, appellant, who had not appeared at the court hearing, told Parker that the restraining order "wasn't valid" because appellant had not appeared, that "[n]othing was going to happen to [appellant]," and that Parker was "dumb" to think that she was going "to get [appellant] locked up[.]"

---

[2] Beginning on July 3, 2010, Parker began to receive occasional calls from "blocked" numbers on her personal cell phone. For the first few days, Parker disregarded the calls to her cell phone because no one would speak on the other line, but during one of the calls to her cell phone, between 1:00 and 2:00 a.m. on July 7, 2010, Parker heard appellant begin to laugh "hysterical[ly]," and say "dumb bitch, I told you I was going to find you[,]" before correctly identifying Parker's home address (where Parker was at the time of the call).

Appellant continued calling Parker through the month of July 2010. Both Parker and appellant appeared at the Superior Court for a hearing on August 18, 2010. During the August 18 hearing, appellant requested that the protective order be "thrown out" because she had not been served and had known nothing about it, a request that the judge, who had heard appellant's references to the July 16 court date on the recordings of appellant's calls, denied. Instead, the court converted the order into a one-year mutual no contact order, and both Parker and appellant expressed, in court, their willingness to avoid contact with each other.

Following the August 18 hearing, Parker, who had a block on her cell phone to stop incoming calls, did not receive calls from appellant for nearly a month. However, the calls resumed on September 12, 2010, after Parker removed the block. On that date, between 2:00 and 3:00 a.m., Parker received a call on her cell phone from appellant. Parker put the call blocker back onto her cell phone, and appellant subsequently resumed calling Parker at PIW, making more than a thousand calls between mid-September 2010 and late February 2011.[3] Nearly 150

---

[3] During the calls that appellant made during this period, she frequently insulted Parker in sexually graphic terms and called Parker insulting names, such as "bitch," "dumb bitch," and "zebra face," but sometimes would merely scream

(continued…)

of these calls were placed after December 3, 2010, and thus violated a criminal stay-away order that the Superior Court entered on that date against appellant in case number 2010-CMD-22628. Many more of the calls also violated a second criminal stay-away order that the Superior Court entered in January 7, 2011, in case number 2011-CF2-3672.[4]

Parker's father died on January 6, 2011, and after his death, Parker had a dispute with her stepmother, Eldora Parker, regarding Parker's father's will. The dispute led Parker and her stepmother to obtain mutual protection orders from a Maryland court on January 12, 2011, that prohibited them from contacting each other. However, on February 5, 2011, Parker received a call on her cell phone that appeared on her phone's caller ID as originating from her stepmother, and later that day, Parker received a call from a police officer, who accused her of having

---

(…continued)
and then hang up, sometimes was silent, sometimes played soft music, and sometimes pressed phone buttons or made "cat noises" or "sucking noises[.]" During numerous calls over this period, appellant would make threats, telling Parker that she would "blow up [Parker's] house . . . [and] family members['] houses[,]" asserting that the "war [wa]s just beginning," repeating Parker's home address and threatening to "send people" to her house, and threatening to "beat [Parker's] ass[.]"

[4] The jury found appellant guilty of contempt charges for having violated the December 3, 2010, and January 7, 2011, orders.

"harass[ed]" her stepmother with numerous phone calls and told her that her stepmother's home caller ID recorded calls from Parker throughout the day. Two days later, Parker discovered that a warrant had been issued in Maryland for her arrest, based on six violations of the no-contact order that she had supposedly committed. Eventually, however, the charges were dropped, and an investigator with the U.S. Attorney's Office discovered that the calls by which Parker had supposedly violated the Maryland no-contact order had actually been made from appellant's phone number using a service called "SpoofCard," which allows a user to make calls appear on the recipient's caller ID as having originated from a different number than that of the actual caller.

During calls from appellant to Parker on February 26 and 27, 2011, appellant told Parker that there was a "warrant [for Parker] in Virginia," and that she "was setting [Parker] up in Virginia[.]" In calls that appellant made around this time to Parker's supervisor at PIW, appellant mentioned Parker's stepmother by name and instructed the supervisor to tell Parker that appellant and Parker's stepmother had "become very good friends," that appellant knew that Parker was "trying to take all the money that [Parker's] dad had left for [Parker's stepmother]" and that appellant and Parker's stepmother "were going to take [Parker] down[.]"

For purposes of the indictment and the jury verdict form, the charged stalking conduct — i.e., the thousands of phone calls that appellant placed to Parker and Parker's stepmother between June 2010 and February 2011 — was divided into one misdemeanor count and four felony counts of stalking, and the court imposed separate sentences for each count. The misdemeanor stalking conviction (the conviction on count 1) is based on the more than 1400 calls that appellant placed, using both her cell phone and her home landline phone, to Parker at PIW between June 14, 2010, and July 16, 2010. The first felony stalking conviction (count 5) corresponds to the more than 800 calls that appellant, using her home landline phone, placed to Parker at PIW and on Parker's cell phone between September 12 and October 24, 2010, all of which violated the no-contact order that the Superior Court had imposed on August 18, 2010.[5] The second felony stalking conviction (count 7) corresponds to the more than 700 calls that appellant, using her home landline phone, placed to Parker at PIW between November 1 and December 2, 2010, (calls that likewise violated the no-contact order that the Superior Court had imposed on August 18, 2010). The third felony stalking conviction (count 14) was based on the nearly 150 calls that appellant placed to Parker between December 4 and December 30, 2010, during which

---

[5] The jury found appellant guilty of several counts of contempt for violation of that order.

appellant used her "SpoofCard" service, presumably in an attempt to disguise her non-compliance with the December 3, 2010, criminal stay-away order. Finally, the fourth felony stalking conviction (count 24) corresponds to the calls that appellant placed to Parker's stepmother between February 5 and February 28, 2010, during which appellant again used her "SpoofCard" service, this time to make the calls appear to have originated from Parker's phone (presumably so as to falsely incriminate Parker for violating the January 12, 2011, Maryland protection order governing Parker and her stepmother).

Following her convictions and the trial court's imposition of a 180-day term of incarceration for the misdemeanor count and one-year terms of incarceration for each of the felony counts — all five of which were to run consecutively — appellant filed her January 30, 2012, motion to correct an illegal sentence.[6] She argued that all of the stalking behavior of which she was convicted constituted a single course of conduct and thus, for purposes of sentencing, should have been treated as a single felony count. On April 17, 2013, the trial court denied appellant's motion to "correct" and reduce her sentence, finding that "each count

---

[6] A trial court "may correct an illegal sentence at any time[.]" Super. Ct. Crim. R. 35 (a). A sentence is "illegal" when the "court goes beyond its authority by acting without jurisdiction or imposing a sentence in excess of the statutory maximum." *Littlejohn v. United States*, 749 A.2d 1253, 1256 (D.C. 2000).

brought by the Government [was] adequately delineated from the other, displaying a logic that dispels any suspicion of arbitrary or excessive prosecution." She now appeals the denial of that motion.

## II. Applicable Law

The District of Columbia statute that criminalizes stalking makes it unlawful to "purposefully engage in a course of conduct directed at a specific individual" with the intent to cause that individual to "[f]ear for his or her safety or the safety of another person[,]" to "[f]eel seriously alarmed, disturbed or frightened[,]" or to "[s]uffer emotional distress[.]" D.C. Code § 22-3133 (a) (2012 Repl.). The term "engage in a course of conduct" is defined to include following, monitoring, surveilling, threatening, or communicating to or about an individual "on 2 or more occasions[.]" D.C. Code § 22-3132 (8) (2012 Repl.). The statute further specifies that "[w]here a single act is of a continuing nature, each 24-hour period constitutes a separate occasion." D.C. Code § 22-3133 (c) (2012 Repl.). The statute also provides that "[t]he conduct on each of the occasions [constituting a course of conduct] need not be the same as it is on the others." D.C. Code § 22-3133 (d) (2012 Repl.).

This court reviews *de novo* "claims involving matters of statutory interpretation[,]" including a claim that an appellant "has been unlawfully convicted for multiple violations of a single statute[.]" *Hammond v. United States*, 77 A.3d 964, 967 (D.C. 2013). "If the unit of prosecution is not clear from the statutory language, . . . it is 'determined by reference to the legislative intent in framing the offense.'" *Id.* (quoting *Williams v. United States*, 569 A.2d 97, 98 (D.C. 1989). When "it becomes necessary to determine '[w]hat [the legislature] has made the allowable unit of prosecution' . . . under a statute which does not explicitly give the answer[,]" "doubt will be resolved against turning a single transaction into multiple offenses[.]" *Bell v. United States*, 349 U.S. 81, 81, 84 (1955); *see also United States v. McLaughlin*, 164 F.3d 1, 15 (D.C. Cir. 1998) ("'Unit of prosecution' cases are thus resolved in favor of lenity.").

## III. Analysis

We have not previously had occasion to interpret the term "course of conduct" as used in D.C. Code §§ 22-3132 (8) and 22-3133 (a) to answer the question presented here: under what circumstances a defendant's stalking behavior

can be said to constitute multiple courses of conduct. However, in applying other statutes, courts, including this one, have determined "how many courses of conduct [a defendant] undertook" by applying "the so-called impulse test[,]" which entails "treat[ing] as one offense all violations that arise from that singleness of thought, purpose or action[.]" *United States v. Grimes*, 702 F.3d 460, 468 (8th Cir. 2012) (internal quotation marks omitted) (holding that where Grimes left twenty-six harassing voicemail messages on six separate days over a course of three weeks, he engaged in "a single ongoing course of conduct" and could be charged with only one, rather than six, violations of 47 U.S.C. § 223(a)(1)(E) (2006)); *see also United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 224 (1952) (holding that because the offense made punishable under the Fair Labor Standards Act is a course of conduct, it is correct to read the statute as "treat[ing] as one offense all violations that arise from that singleness of thought, purpose or action, which may be deemed a single 'impulse[.]'"); *United States v. Smith*, 685 A.2d 380, 385 (D.C. 1996) (holding that the predecessor statute to § 22-3133 required proof that the defendant's conduct "was a 'course of conduct' in that it showed a continuity of purpose.").[7]  More generally, we have held that "criminal acts are considered

---

[7]  This court has not previously had occasion to construe the anti-stalking statute codified in chapter 31A of title 22 of the D.C. Code, but, in a number of opinions, interpreted the now-repealed stalking statute that was codified at D.C. Code § 22-404 (2001).  Because both the current and the predecessor statute

(continued…)

separate when there is an appreciable length of time between the acts that constitute the two offenses, or when a subsequent criminal act was not the result of the original impulse, but a fresh one[,]" *Jenkins v. United States*, 980 A.2d 421, 424 (D.C. 2009) (internal alterations and quotation marks omitted), such that "the defendant can be said to have realized that he has come to a fork in the road" but nevertheless continued his offensive conduct. *Spain v. United States*, 665 A.2d 658, 660 (D.C. 1995); *see also Irby v. United States*, 390 F.2d 432, 437-38 (D.C. Cir. 1967) (en banc) (noting that a defendant's "successive intentions make him subject to cumulative punishment, and he must be treated as accepting that risk, whether he in fact knows of it or not.").

---

(…continued)
criminalized a "course of conduct" made up of multiple acts of harassing or threatening behavior, and because nothing in the legislative history of the current statute indicates an intent by the Council of the District of Columbia to change the substantive meaning of the term "course of conduct," our opinions construing the former statute, including *Smith* and *Washington v. United States*, 760 A.2d 187 (D.C. 2000), guide our analysis here. *See* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON PUBLIC SAFETY AND THE JUDICIARY, Report on Bill 18-151 at 32-34 (June 26, 2009) ("Committee Report") (explaining that the new law was intended to be "more in line with the Model Stalking Code . . . developed by the National Center for Victims of Crime" in that it would address harassment carried out by technology not contemplated by the previous statute, and would handle the "subjective" nature of stalking offenses by ensuring that all charges would be jury-demandable).

In addition to being guided by these more general principles, we note from the language and the legislative history of the current stalking statute that the Council intended to more heavily penalize — and thus to treat differently — a course of stalking by a defendant who "was at the time, subject to a court . . . order prohibiting contact with the victim[.]" Committee Report at 33; D.C. Code § 22-3134 (b). We think it consistent with the legislative intent to treat stalking that post-dates a no-contact order as separate from stalking that precedes that court order. The Council also intended that a defendant "be able to argue that he or she did not know that their actions would cause that specific individual to feel frightened." Committee Report at 34. From this we deduce the rule that stalking conduct that one could reasonably argue would cause a victim to be frightened in a different way from previous or succeeding conduct (or not to be frightened at all) should be analyzed separately, and for that reason should be deemed to constitute a separate course of conduct.[8] We also note from the statutory scheme that, while the Council mandated that continuous conduct over separate days be deemed to constitute separate occasions, *see* D.C. Code 22-3133 (c), neither the statutory language nor the legislative history establishes a basis for assuming that non-

---

[8] The rules we identify in this opinion are not necessarily exclusive of others; there may be other factors, not suggested by the record in this case, that would support treating a defendant's entire course of stalking conduct as separate courses of conduct.

continuous conduct spanning days, weeks, months, or other units of time should on that basis alone be deemed to constitute multiple courses of conduct corresponding to the number of units of time over which the conduct occurred. *Cf. Washington*, 760 A.2d at 199 (holding, on plain-error review, that although the episodes of stalking conduct could be divided into pre-reconciliation and post-reconciliation conduct, there was "a continuing course of conduct from the middle of 1994 until [defendant's] arrest in January 1997" that "constituted a single offense (not two separate offenses)").

Application of the foregoing principles leads us to conclude that, on the basis of the record evidence, appellant could lawfully be punished for only four courses of stalking conduct. The first distinction we draw is between appellant's calls to Parker that preceded the July 16, 2010 restraining order (corresponding to count 1) and appellant's calls to Parker that post-dated and violated that order (and elevated appellant's subsequent stalking offenses to felony offenses under D.C. Code § 3134 (b)(1)).

We similarly distinguish between appellant's calls to Parker that preceded the December 3, 2010, criminal stay-away order entered in case number 2010-

CMD-22628 and appellant's calls to Parker that post-dated that order and continued through December 30, 2010 (calls charged in count 14).[9]

We next distinguish between the phone calls appellant made to Parker in December 2010 and the phone calls, charged in count 24, that appellant placed to Parker's stepmother between February 5 and February 28, 2010, dates that were after entry of the January 7, 2011, Superior Court stay-away order in case number 2011-CF2-3672 and the January 12, 2011, Maryland no-contact order. Even if the February 2011 calls had not post-dated these additional no-contact orders, we would hold that they constituted a separate course of stalking conduct since they were, with the aid of appellant's "SpoofCard" service, made to appear to have originated from Parker's phone. Appellant either knew or should have known that these calls, which made it appear that Parker was violating a court stay-away order and which, predictably, led to criminal charges against her, would cause Parker not only to fear for her safety, to have impaired concentration at work, and to lose her

---

[9] These included calls that appellant made using her "SpoofCard" service. At least arguably, insofar as appellant's resort to the SpoofCard service for these calls could reasonably be expected to cause Parker a different type or degree of fright from that she experienced when she could see from her caller ID that calls were originating from Parker, these calls could be said to constitute a separate course of conduct even without regard to the December 3, 2010, stay-away order. We need not decide the point.

peace of mind, as Parker testified previous calls had done, but also to fear apprehension by the police and the stigma and ordeal of criminal prosecution. Stated differently, the February 2011 calls, which were designed to engender a different type of fear than the previous calls caused, can be said to have reflected a purpose different from appellant's purpose in making the previous calls and to have "invade[d] a different interest," *Gray v. United States*, 544 A.2d 1255, 1257 (D.C. 1988), and for that reason are properly deemed to constitute a separate course of conduct from the prior calls, even irrespective of the January 2011 no-contact orders.

Accordingly, the trial court did not err in denying appellant's challenge to the sentences imposed for counts 1, 14, and 24 (i.e., the misdemeanor stalking count and the fourth and fifth felony stalking counts). As to counts 5 and 7, however, we discern from the record evidence no basis for treating the more than 800 calls that appellant placed to Parker at PIW between September 12 and October 24, 2010, (count 5) as separate from the more than 700 additional calls that appellant made to Parker at PIW between November 1 and December 2, 2010, (count 7). A government witness testified that the calls made during the period described in count 5 were all made to Parker at PIW, as were the calls made during the period described in count 7. Further, in describing the calls, Parker said

nothing (and the prosecutor elicited from her no facts) that distinguished in any legally significant way the calls made during the two periods. The government asserts that count 5 "addressed roughly the first month of harassment that took place after appellant was subject to a restraining order" while count 7 "addressed the second month of post-restraining order harassment[.]" However, nothing in the statute or legislative history suggests that otherwise indistinguishable month-long episodes of stalking conduct should, on the basis of that duration alone, be deemed to constitute separate courses of conduct. *Cf. Washington*, 760 A.2d at 199 (holding that there was "a continuing course of conduct from the middle of 1994 until [defendant's] arrest in January 1997"); *Grimes*, 702 F.3d at 469 (internal quotation marks omitted) (reasoning that repeated conduct "not separated by periods of months or years" can "rightly be called a single episode"). And, to the extent that the statute is ambiguous in this regard, we are obligated by the rule of lenity to resolve the issue in appellant's favor. *Bell*, 349 U.S. at 84 ("if [the legislature] does not fix the punishment for a[n] . . . offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses").

It might be posited that the one-week break in calls from October 24, 2010, to November 1, 2010 — an anomalous period of quiet — corresponded to a fork in

the road and a fresh impulse not in evidence, but we cannot uphold the separate

sentences based on such rank speculation.[10]  We are constrained to conclude

that appellant's calls to Parker during these two periods constituted a single

course of conduct.  Accordingly, we conclude that the trial court erred in

sentencing appellant to separate and consecutive sentences for counts 5 and 7,

and in denying appellant's motion to correct those sentences.[11]  We remand the

case for the trial court to vacate the sentence for one of those two counts (but the

---

[10]  Moreover, there were (what Parker called) other "small break[s] for a couple of days" in appellant's calls to Parker during the time periods corresponding to the other counts in the indictment.  We discern no non-arbitrary basis for distinguishing the October 24 to November 1 break from those other breaks.

[11]  Nothing in this opinion is intended to imply that four stalking offenses were the maximum the government could have charged on the full facts of this case.  Our analysis considers only whether the groupings of stalking conduct as charged by the government, and as punished through the sentences imposed by the court, improperly treated, as separate courses of conduct, conduct that the evidence provided no basis for treating as legally distinct.  Like the trial court — which expressed the view that the government "showed admirable restraint in its decision to charge only five counts of stalking" — we do "not need to reach the question of how many counts the [g]overnment could have potentially charged [appellant] with based on her actions" or "what the upper limit of stalking charges could have been."

court is free to re-sentence appellant so as to impose an aggregate sentence that is comparable to the original aggregate sentence).[12]

*So ordered.*

---

[12] *See Nixon v. United States*, 730 A.2d 145, 155, 155 n.12 (D.C. 1999) (stating that the trial court, which was to vacate either Nixon's conviction for mayhem while armed or aggravated assault while armed and to merge his possession of a firearm during crime of violence convictions into one conviction, "may, in its discretion, alter his sentences"). *Kerns v. United States*, 551 A.2d 1336, 1337 (D.C. 1989) ("Vacation of [an] illegal sentence place[s] appellant in the same position as if he had never been sentenced.").